IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| TOKISHEA HOLLINGSWORTH, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16CV1316 |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Tokishea Hollingsworth ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for Supplemental Security Income on October 4, 2012. (Tr. at 13, 181-86.)[2] Her application was denied initially (Tr. at 68-81), and that decision was upheld upon reconsideration (Tr. at 82-103). Thereafter, Plaintiff requested

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 124-26.) Plaintiff attended the subsequent video hearing on April 1, 2015, along with her attorney and an impartial vocational expert. (Tr. at 13.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 26), and, on September 8, 2016, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

## II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

2

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her October 4, 2012 application date. Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> asthma; obesity; degenerative joint disease of the hip and right knee; chronic pain syndrome; major depressive disorder, severe, recurrent, without psychotic features; posttraumatic stress syndrome (PTSD); bipolar disorder; cocaine dependence in remission; alcohol dependence in remission; and cannabis abuse in remission.

(Tr. at 15.) The ALJ found at step three that none of these impairments, singly or in combination, met or equaled a disability listing. (Tr. at 16.) Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work with myriad additional

5

postural and environmental limitations. (Tr. at 18.) In terms of mental limitations, the ALJ further found that Plaintiff was

> able to understand, remember, and carry out unskilled simple, repetitive and routine tasks for 2 hours at a time with normal breaks. She is able to have superficial contact with others meaning successful performance of job duties involves work primarily with things and not people. She is able to adapt to occasional routine changes in the workplace. She is able to perform tasks that do not require stringent production or a fast pace.

(Tr. at 18.) The ALJ then proceeded to step four, where she found that Plaintiff had no past relevant work. (Tr. at 24.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, she could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 25-26.)

Plaintiff now raises three challenges to the RFC. Specifically, she contends that the ALJ erred in assigning little weight to both the medical source statement completed by Dr. Valerie Murray, Plaintiff's treating psychiatrist, and Plaintiff's global assessment of functioning ("GAF") scores. Plaintiff also argues that both the RFC and the hypothetical question based upon it fail to adequately account for her moderate limitation in concentration, persistence, and pace as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). After a thorough review of the record, the Court finds that none of Plaintiff's contentions merit remand.

A. Treating Physician Opinion

Plaintiff first contends that the ALJ failed to properly weigh the March 24, 2015 medical opinion of Dr. Murray in accordance with 20 C.F.R. § 404.1527(c)(2), better known as the "treating physician rule." The Fourth Circuit has held that for claims, like Plaintiff's, that are filed before March 24, 2017, the ALJ evaluates medical opinion evidence in accordance

with 20 C.F.R. §§ 404.1527(c) and 416.927(c) and the "treating physician rule" embodied within the regulations. Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). Under the regulations, "medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)); see also 20 C.F.R. § 416.927(a)(1). While the regulations mandate that the ALJ evaluate each medical opinion presented to him, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)); see also 20 C.F.R. § 416.927(c)(1). And, under what is commonly referred to as the "treating physician rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2); 20 C.F.R. §416.927(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling 96-2p, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *5 (July 2, 1996) ("SSR 96-2p"); 20 C.F.R. § 404.1527(c)(2); see also Brown, 873 F.3d at 256;

7

Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[5]  Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.  In addition, even if an opinion by a treating physician is given controlling weight with respect to the nature and severity of a claimant's impairment, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone.  20 C.F.R. § 404.1527(d). "Thus, for example, when a medical source renders an opinion that a claimant is 'disabled' or 'unable to work,' the ALJ will consider 'all of the medical findings and other evidence that support' the medical source's opinion, but will not necessarily make a favorable disability determination." Brown, 873 F.3d at 256 (citing 20 C.F.R. § 404.1527(d)(1)); see also 20 C.F.R. § 416.927(d)(1).

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] ... decision for the weight" assigned, taking the above factors into account.  20 C.F.R. § 416.927(c)(2).  "This requires the ALJ to provide sufficient explanation

---

[5] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c.  However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96–2p (noting that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight").

In the present case, Dr. Murray completed a five-page form questionnaire provided by Plaintiff's attorney. (Tr. at 484-88.) Dr. Murray indicated that she treated Plaintiff for major depression once a month for 60 minutes and, from a checklist, identified Plaintiff's symptoms as poor memory, sleep disturbance, personality change, mood disturbance, delusions or hallucinations, substance dependence, feelings of guilt/worthlessness, catatonia or grossly disorganized behavior, and illogical thinking or loosening of associations. (Tr. at 484.) When next asked to describe the clinical findings demonstrating the severity of Plaintiff's mental impairments and symptoms, Dr. Murray failed to answer. However, again from a checklist, she indicated that Plaintiff's impairments would cause her to miss work more than three times a month. (Tr. at 485.)

The questionnaire then asked Dr. Murray to rate Plaintiff's ability to perform basic mental activities of work for a 40-hour workweek, independent of alcohol or drug abuse. Notably, in the definition portion of this section, Dr. Murray circled "Moderate loss," defined as "[s]ome loss of ability in the named activity but still can sustain performance for

9

1/3 up to 2/3 of an 8-hour workday." (Tr. at 485.)[6] When next asked whether Plaintiff's ability to understand, remember, and carry our instructions was affected by her impairment, Dr. Murray marked "No." However, rather than proceeding to the next question as instructed, she then checked "Extreme" or "Marked" loss in eight of the thirteen sub-categories of concentration-related mental activities listed below. (Tr. at 486.) Similarly, Dr. Murray indicated that Plaintiff's ability to respond appropriately to supervision, coworkers, and work pressure was unaffected by her impairment, but then checked "Extreme" or "Marked" loss in all eleven sub-categories of social limitation. (Tr. at 487.) When asked to rate Plaintiff's degree of limitation in four functional areas relevant at step three of the sequential analysis, Dr. Murray again answered inconsistently, finding no limitations in concentration, persistence, or pace, no episodes of decompensation, only "Slight" restrictions in activities of daily living, and "Marked" difficulties in maintaining social functioning. (Tr. at 487.) Finally, Dr. Murray checked "Yes" when asked if Plaintiff could manage benefits in her own best interest. (Tr. at 488.)

The ALJ devoted nearly a full page of her decision to discussing Dr. Murray's opinions.[7] In assigning little weight to Dr. Murray's medical source statement, the ALJ found that the physician's "conclusions [were] contradictory and internally inconsistent." (Tr. at 23.) In addition to noting the inconsistencies and omissions described above, the ALJ explained

---

[6] The remaining three ratings categories consisted of one lower level of impairment, "No/mild loss," and two higher levels of impairment: "Marked loss" and "Extreme loss."

[7] On March 18, 2014, Dr. Murray issued a letter to Disability Determination Services stating that she "deemed [Plaintiff] to be emotionally, mentally, and physical[ly] inept to maintain a job." (Tr. at 397.) The ALJ noted this opinion, but assigned it little weight, because it was "conclusory on an issue reserved to the Commissioner" and was "not consistent with the medical evidence of record." (Tr. at 22.) See 20 C.F.R. § 416.927(d). Plaintiff does not appear to challenge this finding and instead focuses on Dr. Murray's 2015 medical source statement.

10

that the extreme social limitations indicated by Dr. Murray were "not supported by [Plaintiff's] attendance at groups, community, and church events and her ability to interact appropriately with her treating medical providers," and that "[t]he ability to manage benefits is not commensurate with [Plaintiff's] history of substance abuse with recent relapses." (Tr. at 23.) Overall, the ALJ found that opinion was internally inconsistent and that the marked and extreme limitations opined by Dr. Murray were "not supported by the medical evidence, including Dr. Murray's own treatment notes that primarily re-iterate [Plaintiff's] subjective complaints." (Tr. at 23.)

Plaintiff acknowledges the glaring inconsistencies in Dr. Murray's opinion, but argues that, rather than assigning little weight on this basis, the ALJ should have recontacted Dr. Murray for clarification. (Pl.'s Br. [Doc. #13] at 14-16.) However, as both parties recognize, "recontacting a treating physician is discretionary under the regulations." (Pl.'s Br. at 16); (see also Def.'s Br. [Doc. #18] at 8 (citing 20 C.F.R. § 416.920b(c)(1)). The regulations further provide that, "[i]f any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have." 20 C.F.R. § 416.920b(b). Notably, in the instant case, the ALJ not only found Dr. Murray's medical source statement internally inconsistent, but also inconsistent with her treatment notes, the treatment notes of other providers, and Plaintiff's daily activities. With respect to the evidence in the record, the ALJ noted that Plaintiff

> alleged her mental impairments caused crying spells, mood swings, a short attention span, isolation from others, and nightmares. The claimant has a history of marijuana, cocaine, and alcohol abuse. When she initially presented for mental health and substance abuse treatment, she was irritable, agitated, with

11

pressured speech, and did not allow for probing or re-questioning. However, her thoughts were still intact. She started a drug treatment program and continued to respond to situational stressors. She appeared anxious and her speech was rapid. At other times, she appeared depressed with a constricted, flat, or irritable affect. However, she was cooperative. Her thoughts remained intact or coherent and goal directed and her concentration was good. She began to make progress with her goals even when inconsistent with her treatment program. She became more likely to accept redirection. Her episodes of depression became shorter and less intense. Throughout the relevant period, her primary care provider and pain management specialist regularly noted a normal mood and affect as well as a normal memory and logical thinking.
….
. . . [S]he attends substance abuse classes several times per week, is active in her church, works in the community kitchen, and attends her kids' activities. This does not support her reports of isolation or frequent angry outbursts. Treatment records reflect noncompliance with treatment recommendations. She misused her medication, would run out and did not take her medication as prescribed all the time. Even without full compliance, the claimant testified medication helped manage her symptoms. . . . Even while abusing substances, she apparently cared for her 4-year-old daughter with a disability and 4 other minor children. The claimant testified that her mother cares for her children. However, she reported her hobbies including caring for her children, cooking, and being a mother. All of these factors undermine allegations regarding the severity and frequency of symptoms and do not support claims she would be off task 20 percent of the time and miss at least 3 days of work per month.

(Tr. at 20-21 (internal citations omitted).) Having made these findings, the ALJ assigned Dr. Murray's opinion little weight, and after further considering the opinions of the psychological consultative examiner and the state agency psychological consultants, the ALJ ultimately concluded that substantial evidence did not support a finding of disability.

B. GAF Scores

Plaintiff next challenges the ALJ's assessment of her GAF scores. Until 2013, mental health clinicians commonly used GAF scores to estimate an individual's overall functioning level at a given point in time. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000)). A score between 41 and 50 indicated serious symptoms "(e.g.,

suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34. In contrast, a score between 51 and 60 indicated "Moderate symptoms (e.g. flat affect and circumlocutory speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. However, even during their years of wide usage in the mental health field, GAF scores had "no direct legal or medical correlation to the severity requirements of social security regulations." Powell v. Astrue, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013) (citing Oliver v. Comm'r of Soc. Sec., 415 Fed. App'x 681, 684 (6th Cir.2011)). Rather, they were "intended to be used to make treatment decisions." Powell, 927 F. Supp. 2d at 273 (citations omitted).

As this Court detailed in Emrich v. Colvin, the usefulness of GAF scores in the social security context came under further scrutiny when, in May 2013,

> the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") abandoned the use of GAF scoring altogether. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013) (abandoning use of GAF scoring "for several reasons, including its lack of conceptual clarity . . . and questionable psychometrics in routine practice"). In Administrative Message 13066 (AM–13066), effective July 22, 2013, the SSA acknowledged that the DSM had abandoned use of GAF scoring and instructed ALJs that they should still consider GAF scores as opinion evidence in some circumstances. The SSA explained,
>
>> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by §§ 20 CFR 404.1527(c), 416.927(c), and SSR 06–03p, while keeping the following in mind:
>>
>> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a

GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

A GAF score is never dispositive of impairment severity.

Emrich v. Colvin, 90 F. Supp. 3d 480, 492 (M.D.N.C. 2015) (quoting AM-13066).

Here, the ALJ cited Plaintiff's GAF scores, which ranged from 40 to 60,[8] and found that "[t]hese scores represent some impairment in reality testing or communication to serious symptoms." (Tr. at 23, 24.) However, she then explained that "GAF scores are afforded little weight in the disability process," and detailed the rationale behind this determination, essentially echoing the reasons set out above by the Court. (Tr. at 24.) Plaintiff now argues that the ALJ erred in issuing a "blanket rejection" of Plaintiff's scores without attempting "to weigh or discredit the GAF scores in light of the record." (Pl.'s Br. at 25.)

In Sizemore v. Berryhill, the Fourth Circuit recently clarified that an ALJ sufficiently considers a claimant's GAF scores where her decision reflects analysis of the scores themselves "or the text supporting them." 878 F.3d 72, 82 (4th Cir. 2017). Because, in Sizemore, "the ALJ's decision demonstrate[d] a careful consideration of the entire record, including the reasons supporting the GAF scores that were given," the Court found no basis for remand. Id. ("In short, the record does not support Sizemore's argument that the ALJ did not consider

---

[8] As reflected in the ALJ's decision, most of Plaintiff's GAF scores were 45 or 50. (Tr. at 24.) However, in the March 24, 2015 Medical Source Statement, Dr. Murray recorded a GAF score of 40. In contrast, in an April 20, 2013 consultative examination, Dr. Atul Kantesaria recorded a GAF score of "60 by unknown" (Tr. at 377).

14

his various GAF scores or give them appropriate weight. Not only did he consider GAF scores, explicitly reporting a few of them, he considered all of the text that supported the various GAF scores that Sizemore was given.").

Similarly, in the present case, the ALJ cited and discussed the medical records containing Plaintiff's GAF scores. Notably, most of the GAF scores came from Dr. Murray's treatment notes. However, as explained above, the ALJ considered Dr. Murray's opinions and treatment records at length and found them internally inconsistent and inconsistent with the treatment notes of other providers and Plaintiff's daily activities. Based on these findings, the ALJ assigned Dr. Murray's opinions little weight. In contrast, in giving some weight to the opinion of the consultative examiner, Dr. Kantesaria, the ALJ specifically noted that Dr. Kantesaria's report reflected a GAF score of 60 with moderate symptoms, and the ALJ found that Dr. Kantersaria's opinion was "not inconsistent with the residual functional capacity herein." (Tr. at 23.) Thus, the ALJ considered the GAF scores, as well as the underlying treatment records and supporting text, weighed the evidence, explained the decision, and concluded that based on the record presented, Plaintiff retained the ability to function with the limitations set out in the RFC. Because, as in Sizemore, the ALJ considered not only Plaintiff's GAF scores, but also the text supporting them, the Court finds no basis to remand.[9]

---

[9] The Court also notes that many of the GAF scores specifically relate to Plaintiff's functioning level during episodes of continuing drug use. The ALJ noted several instances of relapse in Plaintiff's use of cocaine during this time period (Tr. at 21), and the medical records reflect that Plaintiff was using cocaine in July of 2012 (Tr. at 332, 343) and was "continuing to use cocaine every other day" in September 2012 (Tr. at 316); she later reported that her last use of cocaine was in June 2013 (Tr. at 381); she relapsed with a "recent use of cocaine" in October 2013 (Tr. at 436); she admitted to a relapse in early 2014 (Tr. at 40, 44, 47); medical records in March 2014 noted a "recent relapse with crack cocaine" (Tr. at 472); she had a positive urine test for cocaine in September 2014 (Tr. at 490, 512); and she had other failed or refused drug tests in January and April 2015 (Tr. at 494, 490). The ALJ found that Plaintiff's "drug problems clearly exacerbated her mental health issues" (Tr. at 21), and as in Sizemore, the GAF scores were potentially affected by Plaintiff's substance abuse issues. See Sizemore, 878 F.3d at 82 ("[T]he GAF scores by themselves do not, in this case, negate the other record

15

C.     Concentration, persistence, or pace limitations

At step three of the sequential analysis, the ALJ determined that Plaintiff has moderate limitations in concentration, persistence, and pace. In Mascio, the Fourth Circuit noted that where such limitations are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." 780 F.3d at 638 (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted).

Here, as in Mascio, the ALJ found moderate limitations in concentration, persistence, or pace at step three of the sequential analysis. (Tr. at 17.) However, when later assessing Plaintiff's RFC, the ALJ determined that Plaintiff is able to (1) "understand, remember, and carry out unskilled simple, repetitive and routine tasks for 2 hours at a time with normal

---

evidence supporting the ALJ's determination that Sizemore was not entitled to benefits, especially given that Sizemore's lowest GAF scores were assessed when he was being hospitalized for alcohol detoxification and therefore were not especially meaningful.")

16

breaks," (2) "adapt to occasional routine changes in the workplace," and (3) "perform tasks that do not require stringent production or a fast pace." (Tr. at 18.) Thus, the ALJ included in the RFC multiple specific limitations addressing Plaintiff's limitations in concentration, persistence, and pace. Plaintiff nevertheless contends that this Court should instead conclude that these limitations do not sufficiently address Plaintiff's moderate limitations in concentration, persistence, and pace. However, the ALJ not only included the additional limitations in the RFC, but also specifically explained the decision in this case. As previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> "does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision. . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court."

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff's moderate limitations in concentration, persistence, or pace in light of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)).

In this case, as in Tolbert, the ALJ sufficiently explained why Plaintiff's limitations in concentration, persistence, or pace were accounted for by the RFC. First, the ALJ weighed

the evidence and made specific findings regarding Plaintiff's abilities, and the ALJ then addressed Plaintiff's limitations and abilities by adopting an RFC that not only limited Plaintiff to simple, routine, repetitive tasks, but also limited her to 2 hour increments with only superficial contact with others, only occasional routine changes, and no production or fast pace work. Thus, the RFC includes multiple detailed provisions addressing the specific limitations found by the ALJ in the decision.

In addition, in formulating the RFC, the ALJ specifically discussed the medical evidence and Plaintiff's limitations and abilities. At step three, the ALJ recounted Plaintiff's reports that "she had a difficult time staying focused," "[h]er attention span varied[,] and she did not follow written or spoken instructions well." (Tr. at 17 (citing Tr. at 256, 264-66).) However, the ALJ also noted Plaintiff's hearing testimony that Vyvanse helps her focus and sit for longer periods, and that "she is able to drive and reads the program materials in her substance abuse classes." (Tr. at 17 (citing Tr. at 39, 41, 42).) The ALJ further cited treatment records reflecting that Plaintiff's "thoughts remained intact or coherent and goal directed" and that her "attention and concentration were good." (Tr. at 17 (citing Tr. at 313, 377, 382, 457).) Accordingly, the ALJ concluded that Plaintiff "has no more than moderate difficulties in concentration, persistence, and pace." (Tr. at 17.) When assessing Plaintiff's RFC, the ALJ again noted Plaintiff's allegations that "her impairments affected her memory, ability to complete tasks, concentration, understanding, [and] ability to follow instructions" (Tr. at 18), but found Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms" less than entirely credible (Tr. at 19.) Plaintiff does not challenge the ALJ's credibility determination. Moreover, in making her credibility finding, the ALJ again

18

recounted records reflecting good concentration, normal memory, and logical thinking (Tr. at 21 (citing Tr. at 313, 354, 362, 422, 431, 435, 439, 443, 495, 501, 505, 509, 514, 518, 457)) and specifically found that the record does not support Plaintiff's claims that "she would be off task 20 percent of the time and miss at least 3 days of work per month." (Tr. at 21, 61.) Therefore, "based on the longitudinal evidence of record," the ALJ concluded that

> [Plaintiff] is able to understand, remember, and carry out unskilled[,] simple, repetitive and routine tasks for 2 hours at a time with normal breaks. [Plaintiff] demonstrated logical thinking and intact memory, she cared for a disabled child and other children and worked in the church kitchen. Due to some grogginess from her Seroquel and crediting complaints of lack of focus, she is able to perform tasks that do not require stringent production or a fast pace. She testified her Vyvanse helped her focus and sit longer[,] so further reduction is not warranted.

(Tr. at 22.)

Later in the decision, the ALJ discussed the consistency of these findings with the opinions of the State agency psychological consultants, who found Plaintiff "able to understand and follow short, simple instructions; able to sustain attention to complete a small variety of tasks at a semi-rapid pace; able to interact appropriately with others; able to adapt to routine changes in the workplace; and capable of simple, repetitive and routine tasks with limited social requirements." (Tr. at 24, 77-79, 99-101.) The ALJ assigned great weight to these opinions, but, "[c]rediting [Plaintiff's] side effects from her medication," she "further reduced [Plaintiff] to work that does not require stringent production or a fast pace." (Tr. at 24.) In short, unlike in <u>Mascio</u>, the instant ALJ's discussion of, and reliance on, substantial record evidence adequately explains the extent to which Plaintiff's moderate limitation at step three translated into additional RFC restrictions, including her inability to perform production pace work. Accordingly, the Court finds no error.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on Partial Findings [Doc. #11] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #17] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 13th day of February, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge